**In re Daniel D. McDANIEL and Julia Brown McDaniel d/b/a McDaniel Cattle Co., XQZ Ranch, Pacheco Ranch and McDaniel Petroleum Co., Debtors.**

**Bankruptcy No. 590–50005–11.**

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

May 22, 1991.

---

Robert R. Truitt, Jr., Robert R. Truitt, Jr., P.C., Midland, Tex., for the McDaniels.

Gary Terrell, McWhorter, Cobb & Johnson, Lubbock, Tex., for Paccom.

## MEMORANDUM OF OPINION ON OBJECTION TO THE CLAIM OF PACCOM LEASING

JOHN C. AKARD, Bankruptcy Judge.

Daniel D. McDaniel and Julia B. McDaniel (McDaniels) objected to the claim of Paccom Leasing Corporation (Paccom). The court allows Paccom's claim for $160,-000.00.

### FACTS

On January 4, 1990 the McDaniels filed for relief under Chapter 11 of the Bankruptcy Code. The court confirmed their plan of reorganization by order entered September 4, 1990, and retained jurisdiction to determine objections to claims.

Paccom is an Oregon based equipment leasing company. Paccom's claim is based upon the McDaniels' guaranties of a lease under which Paccom leased equipment to Yoemen Enterprises of Colorado, Inc., d/b/a Quality Steaks (Quality Steaks). Quality Steaks used the equipment at its plant in Denver, Colorado. The McDaniels are Texas residents. They signed the guaranties in Texas. Mr. McDaniel was a director of Quality Steaks at the time the guaranties were signed. The "Master Equipment Lease Agreement" (Master Lease) dated August 20, 1986 concerned a Boldt column dumper with related equipment (Dumper), and other equipment. The

lease was for a 72 month term at $2,443.08 per month. The McDaniels signed a personal guaranty of the lease on August 25, 1986 (Personal Guaranty). Subsequently, the parties entered into "Lease Schedule No. 1" (Schedule 1) dated October 28, 1986 which concerned a Kartridge Pack Chub Machine (Chub) and the monthly payments for that equipment. The McDaniels signed an "Addendum to Personal Guaranty" which described Schedule 1. Finally, the parties entered into "Lease Schedule No. II" (Schedule 2) dated April 13, 1987. It described additional equipment and the monthly payments for that equipment. The McDaniels signed an "Addendum to Personal Guaranty" describing Schedule 2.[1]

Quality Steaks defaulted on the lease and, in early May, 1989, Paccom took possession of the equipment. The Chub was sold in place on May 4, 1989 to a third party for $34,500.00. On the same date the Dumper was sold to a third party for $3,600.00. The balance of the equipment was moved to storage where it remains in spite of Paccom's attempts to sell it at private sale.

Paccom did not give the McDaniels notice of Quality Steaks' default, did not make demand upon the McDaniels to cure the default, and did not notify the McDaniels that Paccom intended to accelerate the obligation and retake possession of the equipment. The McDaniels received no prior notice of the May 4, 1989 sales. The first time the McDaniels heard of these actions was on receipt of a letter from Paccom dated June 7, 1989 entitled "Notice of Private Sale". The notice described the equipment in the Master Lease, Schedule 1, and Schedule 2 (including the Dumper and the Chub). The notice stated that the items would be sold at private sale on or about June 28, 1989. The only sales were the two made before the date of the notice.

The parties stipulated that Paccom's claim is for $257,380.00 less credits for the sale of the equipment and the fair market value of the equipment on hand. Paccom agreed to give credits for $34,500.00 (the sale price of the Chub), $3,600.00 (the sale price of the Dumper) and $59,280.00 which is Paccom's valuation of the equipment on hand, leaving a net claim of $160,000.00.

## POSITIONS OF THE PARTIES

The parties agreed that the lease is a security agreement because Quality Steaks retained the right to purchase the equipment at the end of the lease for $1. The parties also agreed that the McDaniels are "debtors" as that term is used in the Uniform Commercial Code as adopted by both Texas and Oregon.

The McDaniels asserted that the Chub and the Dumper were sold for inadequate prices, that the equipment remaining has a substantially higher fair market value than Paccom's asserted value, that the equipment was in Paccom's possession for an unreasonable length of time resulting in Paccom's accepting it in cancellation of the debt, and that they have no liability to Paccom because they were not given notice prior to the May 4, 1989 sales. As authority for their position, the Debtors cited *Tannenbaum v. Economics Laboratory, Inc.*, 628 S.W.2d 769 (Tex.1982).

Paccom asserted that under Oregon law the sale without notice to the McDaniels resulted in a presumption that the equipment was worth the amount of the debt, which presumption could be rebutted, and that Paccom rebutted that presumption thereby allowing it to recover the balance due on the lease. Paccom cited *All–States Leasing Co. v. Ochs*, 42 Or.App. 319, 600 P.2d 899 (1979) to support its position.

The McDaniels averred that the lease transaction should be construed in accordance with Texas law since the McDaniels are Texas residents and they signed the guaranties in Texas. Paccom argued that Oregon law applied because both the Master Lease and the Personal Guaranty provided that the laws of the State of Oregon governed potential disputes. Neither party

1. References to the Master Lease include the lease schedules and references to the Personal Guaranty include the addendums.

suggested that the court apply Colorado law.

### DISCUSSION

#### *Applicable Law*

■ The Uniform Commercial Code (U.C.C.) was adopted in Oregon as § 71.1010 *et seq.* of the Oregon Revised Statutes. Or.Rev.Stat. § 71.1050 (1989) states:

> [W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties.

Texas adopted the identical provision in § 1.105 of its version of the U.C.C.Tex.Bus. & Com.Code Ann. (Vernon 1968).

The Master Lease provided that its terms would be construed in accordance with Oregon law. Paccom's headquarters are in Oregon and the Master Lease was not effective until Paccom approved it at its office in Portland, Oregon. Disputes under the Master Lease (except for bankruptcy matters) were to be submitted to arbitration under Oregon law in Portland. The lease did not specify where the rental payments were to be made. Any notices under the lease were to go to Quality Steaks in Denver, Colorado, and to Paccom in Portland, Oregon.

The Personal Guaranty, subtitled "Absolute, Unconditional, and Continuing Guaranty Agreement", gave Paccom's address in Portland and called for any notices to be sent to the Debtors at P.O. Box 1138, Cameron, TX 76520. Pertinent provisions of the guaranty read:

> 1. *Guaranty.* Guarantors absolutely, unconditionally and irrevocably guarantee to Lessor the due and punctual payment, observance and performance by Lessee of all of the obligations and liabilities of Lessee under the Lease, both present and future, and any and all subsequent renewals, continuations, modifications, supplements and amendments. If Lessee fails duly and punctually to pay, observe and perform any

or all of the Obligations, Guarantor shall, upon demand by Lessor, immediately pay, perform and observe such Obligations strictly in accordance with the terms of the Lease.
>
> ....
>
> 3. *Waivers of Notice, Etc.* Guarantors waive diligence, presentment, demand, protest or notice of any kind whatsoever with respect to this Guaranty or the Obligations, including without limitation....
>
> (iv) any notice of any sale, transfer or other disposition of any right, title to or interest in the Lease, the equipment or any collateral security, or any part thereof....
>
> ....
>
> 6. *Guaranty of Performance, Etc.* This Guaranty is a guaranty of payment and performance and not of collection....
>
> ....
>
> 13. *Miscellaneous Provisions.* This Guaranty shall be governed by the laws of the State of Oregon. The Guarantors and Lessor hereby consent to the jurisdiction of the Supreme Court of the State of Oregon and of any Federal Court located in such State for a determination of any dispute, outside those that are resolved in arbitration, as to any matters whatsoever arising out of or in any way connected with this Guaranty and authorize service of process on the Guarantors by certified or registered mail sent to the Guarantors at the address for the Guarantors as set forth hereinbelow.

The McDaniels focus on the Personal Guaranty and assert that it does not bear a "reasonable relation" to Oregon, pointing out that they are residents of Texas, that they signed the guaranty in Texas, and that they filed their bankruptcy case in Texas. However, the Personal Guaranty is only one part of this transaction. The McDaniels guaranteed Quality Steaks' payments and performance under the Master Lease. Thus, the court must look to both documents in order to determine whether

the transaction bears a "reasonable relation" to Oregon law. After a thorough consideration of the provisions of the Master Lease described above, the court finds that Oregon law bears a "reasonable relation" to this transaction and that the choice of law provisions in the lease and guaranty should be honored. *See Admiral Ins. Co. v. Brinkcraft Development, Ltd.*, 921 F.2d 591 (5th Cir.1991) (stating that it is permissible for parties to a multistate transaction to include choice of law provisions in their contracts so long as the law they choose bears some relation to the transaction).

### Valuation

■ All witnesses agreed that the equipment in question was highly specialized and that there was no ready market for it. Mr. McDaniel was the only witness on valuation presented by the McDaniels. He stated that when he and "some other people" set up Quality Steaks they found that used equipment cost almost as much as new equipment. Therefore, he thought the equipment should have sold for a price somewhere near its original cost. He stated that the equipment was in good condition and in good working order. Quality Steaks purchased the Chub in 1986 for $50,000.00. It sold on May 4, 1989 for $34,500.00 (69% of its original cost). The testimony and evidence at hearing did not reveal the original cost of the Dumper.

The Denver auctioneer, who assisted Paccom in the repossession, sale and storage of this equipment, testified that in 1989 several meat processing plants closed. Thus, there was a very small market for this equipment in 1989. He testified that the prices received for the Dumper and Chub were reasonable considering the market. He made the sales after consultation with Paccom. Due to the specialized nature and small market for this equipment, he testified that an auction was not an appropriate method of selling the remaining equipment. Although he contacted brokers, dealers and prospective users of the remaining equipment, he was unable to sell any of it.

Paccom based its valuation of the remaining equipment on an appraisal by another independent auctioneer. He based his valuation on market research and an extended time to find buyers. He testified that if the equipment were to sell on a quick sale basis, it would bring approximately one-half of the amount at which it was valued.

Mr. McDaniel is understandably frustrated that the equipment did not sell for enough to pay this obligation in its entirety. However, the court finds that the sale prices achieved by Paccom and Paccom's valuation of the remaining equipment are the fair market values of the items.

### Effect of Lack of Notice

■ A critical issue in this case is the effect of Paccom's failure to give the McDaniels notice of the proposed sale of the collateral. The pertinent portions of the Oregon Revised Statutes read as follows:

79.1050(d) "Debtor" means the person who owes payment or other performance of the obligation secured, whether or not the person owns or has rights in the collateral.

. . . .

79.5040(3) [E]very aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. [R]easonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor.

The McDaniels were "persons who owe payment" under Or.Rev.Stat. § 79.1050. Thus, they were entitled to notice of the proposed public or private sale under Or. Rev.Stat. § 79.5040. What is the effect of Paccom's failure to give that notice? The question is resolved by the decision of the Oregon Court of Appeals in *All–States Leasing Co. v. Ochs*, 42 Or.App. 319, 600 P.2d 899 (1979). In *Ochs* the court was confronted with the argument that the sale was not conducted in a commercially reasonable manner and, for that reason, the

secured party could not collect any deficiency from the debtor. The court considered three lines of authority on this issue and stated "We agree with those courts which have held that a secured party's failure to comply with Or.Rev.Stat. § 79.5040 does not preclude a deficiency." *Id.* 600 P.2d at 906. The court adopted the line of authority which holds:

> Noncompliance with [Or.Rev.Stat. § 79.5040] gives rise to a presumption in favor of the debtor that the collateral was worth the amount of the outstanding debt at the time of default and the debtor is freed from any deficiency unless the creditor proves that the fair market value of the collateral was no greater than the sales price. *Id.* at 906.

Although the court in *Ochs* dealt with the contention that the sale was not conducted in a commercially reasonable manner, that requirement appears in the same subdivision of Or.Rev.Stat. § 79.5040 as the notice requirement. Also, the court did not limit its discussion to the commercial reasonableness requirement but rather referred generally to Or.Rev.Stat. § 79.5040. In the instant case, the parties did not cite any Oregon case dealing specifically with the notice requirement, but the *Ochs* rule, (which appears to have been consistently followed in Oregon) leads this court to conclude that it should be applied to the notice requirement as well. *See also FDIC v. Tempest Fugat*, 75 Or.App. 536, 707 P.2d 81 (1985). The court finds that Paccom overcame the presumption that the collateral was worth the amount of the outstanding debt at the time of default and that Oregon law entitles Paccom to a deficiency judgment.

### Retention of the Collateral

██ The McDaniels argued that Paccom is deemed to have retained the collateral in full satisfaction of the debt. However, Or. Rev.Stat. § 79.5050(2) (1989) dictates a contrary result, stating:

> [A] secured party in possession may, after default, propose to retain the collateral in satisfaction of the obligation. Written notice of such proposal shall be sent to the debtor if the debtor has not signed after default a statement renouncing or modifying the debtor's rights under this subsection.

Paccom gave no written notice of proposed retention to the McDaniels or to Quality Steaks.

In *Fugat, supra,* the Oregon Court of Appeals considered whether a creditor's election to retain collateral in satisfaction of the debt might be implied by conduct. In *Fugat* 22 months passed between repossession and sale of an airplane during which time the sales agent ran up 300 hours of unauthorized use of the airplane. The *Fugat* Court noted three lines of authority on this issue. One line holds that written notice to the debtor is required. "A second approach is that an election can be implied from an unreasonably long retention of the collateral by the secured party and that the determination of what constitutes an unreasonable period of time is a question for the trier of fact." *Id.* 707 P.2d at 84. A third approach requires that the secured party manifest an intent to accept the collateral in satisfaction of the obligation by some conduct other than an undue delay in disposing of the collateral. The court found that it was unnecessary to resolve the lines of authority because "the evidence does not establish, as a matter of law, an implied retention". *Id.* at 85. The trial court found as a matter of fact that the creditor did not manifest an intent to retain the collateral.

The unsold equipment has been stored in the auctioneer's Colorado warehouse since it was repossessed in May, 1989. Paccom and the auctioneer made continuing efforts to try to sell the equipment by written solicitations for bids, one advertisement in a trade journal, as well as direct telephone marketing efforts. The court finds that Paccom has not evidenced, by its actions, any intent to retain the collateral in full satisfaction of the debt. Considering the specialized nature of the collateral, its limited market and depressed economic conditions in general, the court finds that Paccom's efforts to dispose of the remaining equipment were commercially reasonable, and that no undue delay in the disposition

of the collateral occurred which would result in Paccom's legal obligation to keep the collateral in full satisfaction of its debt.

## CONCLUSIONS

The court concludes that Oregon law must be applied to this case and that under Oregon law Paccom's deficiency claim of $160,000.00 must be allowed.

ORDER ACCORDINGLY.[2]

---

**2.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to Contested Matters by Bankruptcy Rule 9014.